**ASSOCIATED FOLDING BOX CO., Inc. et al. v. LEVKOFF et al.**

**No. 4601.**

United States Court of Appeals
First Circuit.

Feb. 5, 1952.

Rehearing Denied Feb. 21, 1952.

Herbert P. Kenway and Robert B. Russell, Boston, Mass. (Kenway, Jenney, Witter & Hildreth, Boston, Mass., on brief), for appellants.

Fritz Ziegler, New York City (Arthur D. Thomson, Boston, Mass., on brief), for appellees.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

WOODBURY, Circuit Judge.

This is an appeal from a final judgment for the plaintiff in a suit for patent infringement wherein, money damages having been waived, the defendants are enjoined from infringing claim 4 of Patent No. 2,342,551 issued to David Levkoff on February 22, 1944, for an improvement in folding paper boxes.

The folding paper or cardboard box art is both old and crowded. Here we are directly concerned with a relatively new subdivision of that art, the art of collapsible cardboard trays, so called. These are typically long, narrow, coverless, and usually rather shallow, cardboard containers used for the packaging of foodstuffs such as fruits and some vegetables, some meat products such as frankfurters, and small bakery products like doughnuts, for the retail trade. Ordinarily after the trays have been set up, or erected, either by hand or by machine at the packing plant, (they are shipped by the manufacturer folded flat to save shipping and storing space) they are filled manually by workers at a conveyor belt which carries the packed trays to a machine which wraps the entire box with its contents in cellophane so that the food will be protected from dust, dirt and handling, but the purchaser may still inspect the contents. The basic requirements of such a tray are that it shall be inexpensive, quick and easy to set up, and stiff enough, particularly at its ends, to resist the pressure exerted by the cellophane wrapping machine in heat sealing the wrapper so that the box will not crumple in the wrapping process thereby damaging the contents of the box and jamming the machine.

The court below found that although it was possible to find one or more of the elements covered by the claim in suit "in a number of the prior patents," none of the prior patents showed the particular assembly of elements covered by the claim, that the assembly produced a new and useful result in that the elements in combination produced a tray which could be set up faster, and moreover one which after it was set up would stay erected so that the packer could use both hands to fill it, that it better withstood the longitudinal pressure exerted by the wrapping machine, and that it "met with great commercial success." Wherefore the court concluded that the patented combination met the test of invention prescribed in Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 1950, 340 U.S. 147, 152, 71 S.Ct. 127, 95 L.Ed. 162, and was valid. The court also found the claim infringed as to which there does not seem to be any very serious question.

Boxes or trays of the type involved are ordinarily stamped out of a single sheet of cardboard. In its most rudimentary form a stamping, or blank as it is called, for a folding box would be either a square or a rectangular piece of cardboard, depending upon the shape of the box desired, having score lines or grooves equidistant from and parallel to each of its four sides and spaced inwardly from the edges of the blank the distance desired for the height of the box. These score lines of course intersect at four points, each point inward from a corner of the blank, and because the lines are all equidistant from the sides, and each is parallel to a side, the score lines define a square at each corner of the blank. The square area so defined is called a corner web, and it is divided into two triangular portions called corner web sections by a diagonal score line extending from the point of intersection of the longitudinal and transverse score lines previously described outward to the corner of the blank. Thus when the side portions and end portions of the blank are bent upward on the longitudinal and the transverse score lines respectively as hinges to form the side panels and end panels of the box, each corner

square can be folded inwardly on the diagonal score line across it and the double thick triangular pieces of material resulting can then be folded against and fastened, by gluing, stapling, sewing, or any other appropriate method, to either an adjacent side wall or end wall to hold the box erected.

The Levkoff patent involved in this litigation covers a tray of the type described at the outset of this opinion having double end walls to provide stiffness and rigidity. The claim in suit is basically for projections called flaps at the four corners of the blank which are so formed that they will constitute the inner end walls of the tray when it is set up for use. Speaking broadly these flaps are formed by extending the side wall panels of a long, narrow cardboard box blank, not only through the outer portions of the end wall panels, as in the simple box described above, but also an equal distance beyond, and then extending the extensions so formed laterally. Thus, if other features to be described presently are disregarded, the blank would give the appearance of having rectangular ears protruding longitudinally and laterally from its four corners. With this construction when the side panels of the blank are folded over flat onto the bottom panel along the longitudinal score lines on which the side walls hinge, and the longitudinal extensions of those lines across the end panels, the laterally extending portions of opposite pairs of ear-like flaps will come together and overlap. In the patented tray the overlapping portions of the flaps are glued together, and the folding and gluing operations are done as part of the process of manufacture, so the boxes are shipped folded, although still flat.

This describes the function of the laterally extending portion of the flaps. The remaining portions of the flaps, the portions extending longitudinally beyond the end panels, are folded when the box is erected for use first inwardly and then downwardly, on score lines appropriately placed, over the corner web sections which are folded flat against the outer end walls, and thus these portions of the flaps form the inner end walls of the structure. Furthermore, according to the teaching of the patent,

they are made of such a size that there will be frictional engagement between the ends of the inner end walls formed by the flaps and the side walls of the tray, which engagement serves to hold the inner end walls in place thereby holding the corner web sections folded back against the end panels and thus to hold the tray set up after it has been erected. In practice, however, projections are usually formed on the outer longitudinal edges of the flaps to form tongues on the flaps when they are glued together which slip into slots cut in the bottom panels of the box just inside the score lines on which the end panels hinge, and this tongue and slot arrangement serves to lock the inner end walls in place.

With this construction when an operator using both hands grasps the flat folded blank as it comes from the factory by its ends, and lifts the end panels on the score lines on which they hinge, the corner web sections adjacent thereto hinge inwardly on the diagonal score lines across the corner webs, and in doing so lift the side panels to a vertical position. Then the operator with a twist of the wrists and a flick of the thumbs pushes the longitudinally extending portions of the glued-together flaps in and down over the corner web sections which are folded flat against the end panels, and locks the inner end walls thus formed into place, either by pushing the tongue into the bottom slot, or by pressing the inner end wall into frictional engagement with the side panels, depending on the type of construction of the flaps. Thus the tray is erected easily and very rapidly, and will stay erected for use. Moreover, this construction, by using the inner end wall as the means to hold the tray in set-up position, leaves the outer end wall free so that its outer border can be extended somewhat to form a cover rest flap, so called, which can be bent on an appropriate score line horizontally inward to support the cellophane wrapper, and also to cover and protect the fruit or bakery product at the end of the tray.

The foregoing description is not readily intelligible we freely confess. But it is the best this writer can do and we believe it to be essentially accurate. Perhaps it can be

summarized by the statement that in its essence the claim in suit is for flaps formed from longitudinal and lateral extensions of the side walls of a collapsible cardboard box or tray, the laterally extending portions of which will overlap and are glued together when the side walls are folded flat inwardly, and the longitudinally extending portions of which can, as the tray is set up, be folded inwardly and downwardly over the corner web sections, not only to form inner end walls, but also to serve to hold the box or tray in set-up position by frictional engagement with the inside of the side panels.

The claim in suit reads as follows: "4. A folding box formed from a single blank of cardboard including a bottom wall, a pair of side walls and a pair of outer end walls hinged to said bottom wall, folding corner webs hinged to the adjacent ends of said side and end walls, a score line extending diagonally across said corner webs dividing each of said corner webs into substantially triangular shaped web sections with one section hinged to the side wall and the other section hinged to and overlying the adjacent outer end wall, inner end wall flap sections hinged to those sections which are hinged to the adjacent outer end wall, the pair of flap sections at each end overlapping and being adhesively secured to provide a single inner end wall locking flap which is folded inwardly and downwardly against the folded corner web sections and having frictional engagement with the side walls, and top flaps hinged to and integral with the outer end walls and folded inwardly therefrom to a substantially horizontal position."

We need not concern ourselves with the features enumerated at the outset of the claim, such as a box of the folding type, formed from a single sheet of cardboard, having a bottom panel with side and end walls hinged thereto on score lines, and corner webs divided diagonally by score lines into substantially triangular sections which are hinged to adjacent side and end walls. These elements are all freely conceded to be not only old but ancient in the art. Our primary concern is with the part of the claim which reads: "inner end wall flap sections hinged to those sections which are hinged to the adjacent outer end wall, the pair of flap sections at each end overlapping and being adhesively secured to provide a single inner end wall locking flap which is folded inwardly and downwardly against the folded corner web sections and having frictional engagement with the side walls."

The last element covered in the above quotation from the claim, that is, a single inner end wall locking flap folded inwardly and downwardly against the folded corner web sections and having frictional engagement with the side walls to hold it in place, and thus to hold the box in set-up position, need not detain us long. This feature seems to us to be clearly disclosed in Patent No. 1,425,068 for a collapsible folding box issued to S. F. Sutherland on August 8, 1922. Sutherland clearly shows a single inner end wall locking flap apparently in frictional engagement with the side walls of his box to cover the corner web sections and hold the box erected for use. It is true, however, that Sutherland's inner end wall locking flap is formed from a separate piece of cardboard which is stitched to the outer edge of each end wall, either through the edges of its adjacent corner web sections or not as desired. But this does not seem to us of any particular significance, or he says that this sewing construction is preferable because it is more economical of material, "whereas there will be considerable waste of material if the flap is an integral part of the blank, cut out with the blank." Furthermore, Sutherland's construction lends itself readily to a slight modification to provide "top flaps hinged to and integral with the outer end walls and folded inwardly therefrom to a substantially horizontal position," i.e. cover rest flaps, called for as the final element of the claim in suit. It is true, however, that cover rest flaps could not be formed from the outer end walls of Sutherland's box if this inner end wall locking flaps were cut out as integral parts of his outer end walls rather than stitched thereto. But we do not think this fatal to anticipation with respect to the part of the claim under consideration, for if his inner end

walls were cut as integral parts of the blank, appropriately shaped separate pieces could readily be attached to Sutherland's outer end walls by the stitching method he suggests to form cover rests flaps if they were desired in a box of his type. This is a minor matter, however, in view of the patent to Elliott to be considered presently.

We come, therefore, to Levkoff's overlapping flap sections adhesively secured and so arranged as to provide inner end walls, as well as locking devices, which are the heart of his claim.

Flap sections are undoubtedly old. And flap sections, the laterally extending portions of which overlap and are adhesively secured to one another when the side wall panels are folded over flat onto the bottom panel, were not new with Levkoff. They are clearly shown in Patent No. 2,220,121 issued to W. A. Ringler, on November 5, 1940. Ringler's flaps, however, although attached to corner webs hinged to adjacent walls like Levkoff's, are not, like the latter's, hinged, and do not extend longitudinally as well as laterally. Hence, although with a simple modification as to shape they could be made to form inner end walls, they could not be made to form inner end walls to lock the box in set-up position without at least more radical modification. Therefore Ringler does not fully anticipate the Levkoff claim in suit.

A Canadian patent issued to David Elliott on May 8, 1906, (No. 98,911) however, supplements Ringler, for Elliott shows hinged flaps extending longitudinally, in this respect as in Levkoff, and also folding the longitudinally extending portions of the flaps inwardly and downwardly against the outer end walls and over the folded-back corner web sections to lock the box in set-up position. But Elliott's flaps do not provide inner end walls comparable to those shown in Sutherland, nor does Elliott, like Levkoff and as indicated by Sutherland, use frictional engagement[1] to hold his flaps in place. He uses a slot and tongue construction to hold them in position, and being only locking devices, they are little more

than tabs. But this we think is not vital, for Elliott was not concerned with a double end wall construction. He shows a practically square, relatively flat box, having a cover consisting of a flap integral with and hinged to the outer border of one side, and cover rest flaps integral with and hinged to the outer borders of his end wall panels, the latter being features which his construction, like Levkoff's, readily permits. If Elliott's cover were eliminated, and the proportions of his box changed to make it long and narrow like a tray, then when the sides of his box were folded over his locking flaps would come close together, and, if a double end wall for stiffness were important, the expedient of extending the flaps laterally to form an inner end wall would we think readily occur to anyone even slightly skilled in the art. And this expedient would certainly be obvious to anyone familiar with the teaching of Ringler. With this step taken, then alteration of the shape of Elliott's flaps to give them frictional engagement with the side panels, like Sutherland's inner end walls, instead of the tongue and slot construction shown, would be but a minor step indeed. Thus we think that Elliott's box, minus the cover and modified in its proportions, with alteration of the shape of his flaps to make their laterally extending portions overlap for securing adhesively, like Ringler's, plus modification of their longitudinally extending portions to provide a frictionally secured inner end wall locking flap as indicated by Sutherland and concededly old in the art, gives the tray covered in Levkoff's claim 4. Hence, even without reference to an earlier patent to Levkoff (No. 2,274,714) wherein it seems to us that his present invention is clearly shown in some of the drawings but not claimed, we think each element of Levkoff's claim in suit is either actually disclosed or clearly foreshadowed in the prior art. We have before us, therefore, a claim for a combination of elements each of which is old in the art.

We therefore are confronted with the same question we considered recently in McCord Corp. v. Beacon Auto Radiator

1. Frictional engagement for a locking flap is admittedly old in the art. See Simplex Paper Box Corp. v. Rosenthal Paper Co., 8 Cir., 1939, 104 F.2d 349.

Co., Inc., 1 Cir., 193 F.2d 985. And much that we said in our opinion in that case is applicable to this one for Levkoff's tray did nothing, (performed no function) that trays had not done before. The old elements which he combined each performed its old function in the combination, and their performance in concert was no more than the sum of their performances individually. Nor do we think that any extraordinary insight or unusual perspicacity was required to conceive of his combination of old elements, and certainly no remarkable talent was required to integrate the old elements in a single structure. His new and useful result was not a radically different tray, although it may have been, and probably was, a better one. We look, therefore, to see whether the improvement Levkoff wrought was an unusual or surprising consquence of the unification of the old elements he accomplished, and we are constrained to say that it was not. That is to say, scrutinizing the claim in the light of the severe test applicable now, we are forced to the view that while Levkoff made an improvement, his improvement did not amount to a sufficiently radical innovation to warrant a finding of invention.

The specific problem to which Levkoff addressed himself, that of providing stiff ends for a collapsible box or tray which could be cheaply stamped out of a single sheet of cardboard and quickly erected, was not particularly old, and it would not seem to be especially baffling. So far as we can tell from the record the problem was not one which had gravely perplexed the trade for years, or one that had been given lengthy and exhaustive study by numerous experts. Levkoff's solution was ingenious, and no doubt it was welcome, but on the record we cannot say that it was startling or revolutionary. In short, we think he did not make an inventive contribution to his art, but merely accomplished an ingenious perhaps, but still minor improvement in it, and that his commercial success, such as it was, cannot save his patent, for the issue of invention is not here in doubt.

The court below, therefore, erred in using a less exacting standard of invention for judging the validity of the claim for a combination made up entirely of old components than that required by the Great Atlantic & Pacific Tea Co. case, supra, and in consequence its judgment cannot stand.

The judgment of the District Court is set aside and the case is remanded to that court for entry of a judgment for the defendant; the appellants recover costs on appeal.